ASSOCIATION OF AMERICAN
RAILROADS, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

S. C. Loveland Co., Inc., Intervenor.

No. 76–1623.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 22, 1977.
Decided July 29, 1977.

Thomas C. Dorsey, Washington, D.C.,
with whom Harry J. Breithaupt, Jr., Wash-
ington, D.C., was on the brief for petitioner.

Christine N. Kohl, Atty., I.C.C., Washington, D.C., with whom Robert S. Burk, Acting Gen. Counsel, I.C.C., and Lloyd John Osborn, Atty., Dept. of Justice, Washington, D.C., were on the brief for respondent. Peter A. Fitzpatrick, Asst. Gen. Counsel, I.C.C., Washington, D.C., also entered an appearance for respondent, I.C.C.

Donald Macleay, Washington, D.C., with whom Neal A. Jackson, Washington, D.C., was on the brief for intervenor.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

■ The "custom-of-the-trade provision" of section 303(b) of the Interstate Commerce Act, 49 U.S.C. § 903(b), exempts from Interstate Commerce Commission regulation the carriage by water carrier of "commodities in bulk which are (in accordance with the existing custom of the trade in the handling and transportation of such commodities as of June 1, 1939) loaded and carried without wrappers or containers and received and delivered by the carrier without transportation mark or count." From the time of its enactment in 1940 until 1976, the ICC interpreted this provision to exempt from ICC regulation only the carriage of those commodities *actually* carried in bulk as of June 1, 1939. In 1975, barge

operators filed a petition seeking cancellation of a tariff for the carriage of bulk grains. A Commission administrative law judge concluded that the petitioners had not met their burden of proof that the commodities were exempt under section 303(b).[1] On appeal, in response to a suggestion by an intervenor, the Commission's Division 2 reinterpreted that provision to instead exempt the carriage by water of all bulk commodities transported *in the manner* in which commodities were carried in bulk on June 1, 1939, whether or not the particular commodity in question was carried in bulk on that date. It concluded that all of the commodities involved in the tariff in issue were therefore exempt from regulation, and that the tariff should be cancelled in its entirety.[2] A show cause order, inviting any interested party to show cause why the division's conclusions should not be adopted, was published on February 4, 1976.[3] The Association of American Railroads (Railroads), although not originally a party, filed a petition in response to this publication seeking reconsideration of the division's reinterpretation of the "custom-of-the-trade provision."[4] The division denied this petition,[5] and the Commission, in general session, denied the Railroads' subsequent petition seeking a finding that the proceeding involved an issue of general transportation importance.[6] The Railroads then filed the present petition for review, and S. C. Loveland Company, a certified water carrier, has intervened.[7]

The Commission suggests that neither the petitioner nor the intervenor has shown that any particular commodity would be exempt, under this interpretation that would not already have been exempt, and that thus they have suffered no injury in fact and have no standing to challenge the Commission's order. ICC Brief at 29–31. We reject this argument for several reasons. First, in denying the Railroads' petition the Commission did not rely on this ground, No. 8962 (ICC June 16, 1976), J.App. 110. Second, the Commission has radically changed its long-standing interpretation of a statute that directly affects the business in which they are engaged. This is sufficient to distinguish the present case from *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) and *Chemehuevi Tribe of Indians v. FPC*, 160 U.S.App.D.C. 83, 88 n. 12, 489 F.2d

---

1. No. 8962 (ICC Jan. 23, 1975), J.App. 12.

2. Bulk Grain in Bargeloads, Middlewest, South and Southwest, 351 I.C.C. 422 (1976).

3. 41 Fed.Reg. 5166 (1976).

4. The Railroads did not, however, object to the cancellation of the particular tariff in issue. *See* note 14 *infra*.

5. No. 8962 (ICC May 18, 1976), J.App. 105.

6. No. 8962 (ICC June 16, 1976), J.App. 110.

7. This court's jurisdiction to review such orders of the Interstate Commerce Commission is based on 28 U.S.C. §§ 2321(a), 2342(5) (Supp. V 1975).

## I.

Section 303(b), as originally enacted in the Transportation Act of 1940,[8] excepted the transportation by water carriers of "commodities in bulk" from regulation by the ICC, but provided that this exception would apply only where three criteria were satisfied: (1) "the cargo space of the vessel in which such commodities are transported is being used for the carrying of not more than three such commodities" (the "three-commodity restriction"); (2) the bulk commodities be ones "which are (in accordance with the existing custom of the trade in the handling and transportation of such commodities as of June 1, 1939) loaded and carried without wrappers or containers and received and delivered by the carrier with-

out transportation mark or count" (the "custom-of-the-trade provision"); and (3) the "no-mixing rule."[9] In addition, the section provided that "two or more vessels while navigated as a unit [barges] shall be considered to be a single vessel." Each of these restrictions had been subject to criticism, and all except the custom-of-the-trade provision were repealed when the section was amended in 1970[10] and 1973. Section 303(b) now states:

Nothing in this [part] shall apply to the transportation by water carriers of commodities in bulk. This subsection shall apply only in the case of commodities in bulk which are (in accordance with the existing custom of the trade in the handling and transportation of such commodities as of June 1, 1939) loaded and

1207, 1212 n. 12 (1973), *vacated on other grounds*, 420 U.S. 395, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975). In each of these cases there was no showing that the petitioners even used the area to be affected by the administrative action. Finally, the legislative history of the 1973 amendment suggests that while only one commodity that would be affected by repeal of the custom-of-the-trade provision was presently "moving in significant quantities," *see* text at note 25 *infra*; note 34 *infra*, this recognizes that other commodities are affected to some degree. The Commission has also stated that various chemicals are affected. *See* note 18 *infra*. We conclude that petitioner has standing sufficient to maintain the present action.

**8.** The section provided:

Nothing in this [part] shall apply to the transportation by a water carrier of commodities in bulk when the cargo space of the vessel in which such commodities are transported is being used for the carrying of not more than three such commodities. This subsection shall apply only in the case of commodities in bulk which are (in accordance with the existing custom of the trade in the handling and transportation of such commodities as of June 1, 1939) loaded and carried without wrappers or containers and received and delivered by the carrier without transportation mark or count. For the purposes of this subsection two or more vessels while navigated as a unit shall be considered to be a single vessel. This subsection shall not apply to transportation subject, at the time this part takes effect, to the provisions of the Intercoastal Shipping Act, 1933, as amended.

Transportation Act of 1940, Pub.L. No. 76–785, § 201, 54 Stat. 931.

**9.** The "no-mixing rule," which made the exemption unavailable whenever the bulk commodities were carried together with any non-bulk commodities, was derived not from the express language of section 303(b) but from the Commission's construction of the general intent of the section. *See Gulf Canal Lines v. United States*, 258 F.Supp. 864, 868–69 (E.D. Tex.1966), *affd. mem.*, 386 U.S. 348, 87 S.Ct. 1161, 18 L.Ed.2d 98 (1967); 2 U.S. Department of Transportation, The Barge Mixing Rule Problem: A Report to the Congress, App. C.10–C.18 (1973) [hereinafter cited as DOT Report].

**10.** The 1970 amendment added a sentence immediately following the "custom-of-the-trade" provision, stating: "The exemption afforded under this subsection to the transportation by a water carrier of commodities in bulk shall not be lost by the concurrent transportation in the same vessel of other commodities." Act of December 28, 1970, Pub.L. No. 91–590, § 1, 84 Stat. 1587. Section 2 of this Act provided that the amendment would expire at the end of three years from its enactment, and directed the Secretary of Transportation, with the assistance of the Interstate Commerce Commission and the Secretary of the Army, to "undertake a comprehensive study of the present system of economic regulation of dry bulk commodity transportation," and to complete this study within two years. The result was the DOT Report, *supra* note 9. *See generally* S.Rep. No. 91–1330, 91st Cong., 2d Sess. (1970) [hereinafter cited as 1970 Senate Report]; H.R. Rep. No. 91–1774, 91st Cong., 2d Sess., U.S. Code Cong. & Admin.News 1970, pp. 5155, 5173 (1970) (conference report).

carried without wrappers or containers and received and delivered by the carrier without transportation mark or count. This subsection shall not apply to transportation subject, at the time this part takes effect, to the provisions of the Intercoastal Shipping Act, 1933, as amended.[11]

We conclude that the language of the "custom-of-the-trade provision" in the 1940 Act and which was retained without change in the 1970 and 1973 amendments is susceptible on its face to either interpretation urged by the parties to this petition for review. We therefore proceed to consider other indications of the meaning intended by Congress.

## II.

The Commission concedes that for 35 years, it interpreted the custom-of-the-trade provision to exclude from regulation only the carriage by water of commodities actually carried in bulk on June 1, 1939.[12] The 1973 amendment left the language of the custom-of-the-trade provision unchanged. The Railroads and the intervenor argue that the Congress in 1973 was clearly aware of the Commission's longstanding interpretation of that provision, and that the Commission is barred by the "doctrine of reenactment" from now changing its interpretation. On the other hand, the division in its report and order relied principally on its view that the legislative history of the 1973 amendment *justified* a reinterpretation of the provision. We find this claim to be unsupported and the Commission in this court does not rely directly on this argument.[13] Instead it bases its response primarily upon the division's alternative holding that the new interpretation is necessary because the original interpretation was incorrect.[14] In support of this position, however, the Commission contends that "[a] review of the legislative history of Section 303(b) of the Act, particularly as amended in 1973, and as discussed in the Commission's report at issue herein, . . . is indeed the proper one." [15] We therefore consider the legislative history of the 1973 amendment and determine what effect, if any, it should have on the disposition of this case.

There is ample evidence in the legislative history of the 1973 amendment that the Congress did not intend thereby to alter the meaning of the custom-of-the-trade provision, and the Commission was therefore well advised in electing not to rely directly upon the division's reading of that history.

---

**11.** Act of December 27, 1973, Pub.L. No. 93–201, 87 Stat. 831, *as codified*, 49 U.S.C. § 903(b) (Supp. V 1975).

**12.** ICC Brief at 5. *See A.L. Mechling Barge Lines, Inc., Investigation of Operations*, 325 I.C.C. 745 (1964); *Inland Navigation Co. Applications*, 250 I.C.C. 703 (1943). In *Inland Navigation*, the Commission's first occasion to interpret the custom-of-the-trade provision, it suggested that the commodity must have actually been carried in bulk on the particular waterway as of June 1, 1939. 250 I.C.C. at 706. In *Mechling*, the Commission broadened its initial interpretation to cover all commodities that were carried in bulk on June 1, 1939, without regard to particular waterways or even whether the transportation had been by "water, rail, motor or air," 325 I.C.C. at 750. *See* DOT Report, *supra* note 9, at App. C.5–C.7. There was no suggestion in either of these decisions, however, that the provision applied to commodities not actually carried in bulk by some mode on June 1, 1939.

**13.** *See* note 34 *infra*.

**14.** 351 I.C.C. at 432–35. The Railroads did not object to the division's order cancelling the particular bulk grain tariff in issue in the proceeding now under review, Railroads' Brief on Petition for Reconsideration 2 n., J.App. 85. Thus neither the Railroads nor Loveland seek review of the division's conclusion that the custom-of-the-trade provision excludes from ICC regulation commodities that were actually carried in bulk on June 1, 1939, but are now carried in "slightly changed form . . . such as pelletizing," 351 I.C.C. at 432. Accordingly, we disturb neither this conclusion nor the cancellation of the tariff. We note, however, that the Commission has apparently never expressly concluded that at least one of the commodities in the tariff, pelletized alfalfa, was carried in bulk in any form on June 1, 1939. Commodities which the ICC has concluded were so carried are listed in 2 DOT Report, *supra* note 9, at App. C.19–C.21. *See* 351 I.C.C. at 432 n. 16.

**15.** ICC Brief at 18.

It was no accident that the 1970 and 1973 amendments left intact only the custom-of-the-trade provision, of the three restrictions in the original section 303(b). For a number of years, the restrictions in section 303(b) presented no problems for barge operators. In later years, however, water carrier operations evolved and tow boats became larger and more powerful, permitting larger tows. The 1940 limitations in section 303(b) made operations increasingly inconvenient and inefficient.[16] A number of bills attempting to deal with the "mixing rule" problem were introduced, beginning with the 87th Congress. Bills introduced to the 90th Congress in 1967 would have repealed not only the no-mixing rule and the three-commodity restriction, but also the custom-of-the-trade provision.[17] At subcommittee hearings, the elimination of all three restrictions was vigorously supported by the Commission [18] and by various shipper representatives.[19] The testimony of each assumed the correctness of the Commission's prior interpretation of the custom-of-the-trade provision.

Instead of the sweeping amendment proposed in 1967, the Congress in 1970 adopted a more limited amendment temporarily suspending the effect of the no-mixing rule. In the same Act, Congress directed the Department of Transportation (DOT), with the assistance of the Interstate Commerce Commission and the Secretary of the Army, to "undertake a comprehensive study of the present system of economic regulation of dry bulk commodity transportation," and to complete the study within two years.[20] The result of this order was a two-volume report submitted to the Congress in 1973.[21] In this report, DOT summarized the existing language and interpretation of section 303(b), collected and analyzed data concerning its application and effect, and recommended permanent statutory amendment. The summary of the meaning of the custom-of-the-trade provision is in accord with the Commission's interpretation at that time.[22] DOT concluded that "[t]he Three-Commodity-Restriction is confusing, has never had universal compliance, and has not been the subject of formal enforcement action," and that "[t]he No-Mixing Rule has never directly affected the operating practices of the inland water carriers; in its early years the status of barge technology made the Rule irrelevant while in recent years its enforcement has been held in

---

16. *See* S.Rep. No. 93–513, 93d Cong., 1st Sess. 1 (1973), U.S.Code Cong. & Admin.News 1973, p. 2923 [hereinafter cited as 1973 Senate Report], 1970 Senate Report, *supra* note 10, at 1, U.S.Code Cong. & Admin.News 1970, p. 5155; 1 DOT Report, *supra* note 9, at I.1–I.6, V–B.1–B.3.

17. *See Water Carrier Mixing Rule Exemption: Hearings on H.R. 7610 before the Subcomm. on Transportation and Aeronautics of the House Comm. on Interstate and Foreign Commerce*, 90th Cong., 1st Sess. 1 (Oct. 4, 10–12, 1967) (introductory remarks of Rep. Samuel N. Friedel, Subcomm. Chairman) [hereinafter cited as 1967 *House Hearings*]. Twelve identical bills were introduced in 1967, and consolidated hearings were conducted. *Id.*

18. *Id.* at 3–5 (letter from Committee on Legislation, Interstate Commerce Commission). Regarding the custom-of-the-trade provision, the Commission representatives stated: "The definition of bulk commodities in terms of the custom of the trade as of June 1, 1939, has resulted in much confusion and some litigation. Many commodities, such as *chemicals and sugar*, were carried by water carriers in containers

as of June 1, 1939, but because of efficiency and convenience are now carried in bulk in modern barges and tankers." *Id.* at 4; *id.* at 86 (statement of William H. Tucker, Chairman, Interstate Commerce Commission) (emphasis added).

19. *See, e. g., id.* at 116 (statement of J.A. Griffin on behalf of National Plant Food Institute); 160 (statement of John E. Gross, Chairman, Inland Waterway Committee, National Industrial Traffic League).

20. Act of December 28, 1970, Pub.L. No. 91–590, 84 Stat. 1587. *See* note 10 and accompanying text *supra.*

21. DOT Report, *supra* note 9.

22. "The Custom-of-the-Trade Provision is one of the grandfather clauses of the Transportation Act of 1940 and has had the effect of limiting the exemption of Section 303(b) of the ICC Act to those commodities being carried in dry bulk traffic as of July 1, 1939." 1 DOT Report, *supra* note 9, at V–A.1. Also *see* 2 DOT Report, *supra* at App. C.5–C.7.

abeyance."[23] The Department therefore recommended that both of these restrictions be repealed.[24] The Department, however, reached a contrary conclusion regarding the custom-of-the-trade provision:

> After reviewing the detailed records of the regulated dry bulk commodity movements which actually move regulated, and polling a wide and representative sample of barge and chemical industry experts, it was found that sugar is the only commodity moving in *significant quantities* on the inland waterways that would be affected by dropping the Custom-of-the-Trade provision.[25]

The Department noted that repeal of the provision would probably have little effect on the price of sugar, and as a result of these findings, recommended that:

> No change need be made in the Custom-of-the-Trade Provision at this time. Nevertheless, there exist strong theoretical arguments for doing so at some time in the future. When and if a new dry bulk commodity emerges which, except

for the Custom-of-the-Trade Provision, would be eligible for the Section 303(b) exemption, favorable consideration should be given to the elimination of the Provision or to the giving of comparable relief.[26]

At Senate and House subcommittee hearings, the Department explained its conclusions and recommendations,[27] and industry representatives endorsed its views.[28] The Commission, however, again argued that the custom-of-the-trade provision should also be repealed.[29]

In its Report, the Senate Committee on Commerce included the comments of both the Department and the Commission.[30] The Department's comments restated the accepted meaning of the custom-of-the-trade provision: "All dry bulk commodities transported by water are exempt from economic regulation provided they were moved in bulk by water on or prior to June 1, 1939."[31] The Commission once again recommended the repeal of all three restrictions in section 303(b).[32] The Committee,

**23.** 1 DOT Report, *supra* note 9, at 3.

**24.** *Id.* at 5, V–B.9, V–C.4.

**25.** *Id.* at V–A.1 (emphasis added). Also *see id.* at 3.

**26.** *Id.* at 5 (emphasis in original).

**27.** *Barge Mixing Rule Legislation of 1973: Hearing on S. 2267 before the Subcomm. on Surface Transportation of the Senate Comm. on Commerce*, 93d Cong., 1st Sess. 6–10 (Sept. 25, 1973) (statement of Robert H. Binder, Acting Assistant Secretary for Policy, Plans, and International Affairs, Department of Transportation) [hereinafter cited as 1973 *Senate Hearing*]; *Water Carrier Mixing Rule—1973: Hearing on H.R. 9772 et al. before the Subcomm. on Transportation and Aeronautics of the House Comm. on Interstate and Foreign Commerce*, 93d Cong., 2d Sess. 12–16 (Dec. 11, 1973) (statement of John W. Snow, Deputy Assistant Secretary for Policy, Plans and International Affairs, Department of Transportation) [hereinafter cited as 1973 *House Hearing*].

**28.** *See, e. g.,* 1973 *Senate Hearing, supra* note 27, at 14–16 (statement of Floyd Baske, President, American Commercial Barge Line); 1973 *House Hearing, supra* note 27, at 34–35 (statement of David T. Sheehy, President, M/G Transportation Co.).

**29.** *See* 1973 *Senate Hearing, supra* note 27, at 3–5 (letters from George M. Stafford, Chairman, Interstate Commerce Commission); 1973 *House Hearing, supra* note 27, at 5–8 (statement of George M. Stafford, Chairman, Interstate Commerce Commission).

**30.** S.Rep. No. 93–513, 93d Cong., 1st Sess. (1973), U.S.Code Cong. & Admin.News 1973, p. 2923 [hereinafter cited as 1973 Senate Report].

**31.** *Id.* at 5 (letter from Claude S. Brinegar, Secretary of Transportation).

**32.** We object to those portions of the [DOT] report which recommend that the custom-of-the-trade provision be retained and that the publication of rates for the transportation of the exempt commodities not be required.

According to the Department's report, sugar is the only important commodity moving in bulk which does not qualify under the custom-of-the-trade provision. Moreover, the report reveals that repeal of the provision would have little impact on sugar traffic and the rates and operations of water carriers. We find this provision confusing and obsolete, and in keeping with the findings made by the Department in its report, we recommend that it be repealed. . . .

*Id.* at 8 (letter from George M. Stafford, Chairman, Interstate Commerce Commission).

however, adopted the recommendations of the Department of Transportation "that the three commodity restriction and the no mixing rule be permanently repealed," but "that the custom-of-the-trade provision not be altered at this time." [33] There was no house report, and the Senate bill, which retained the custom-of-the-trade provision without change from its original 1940 language, was enacted into law.

In review, it appears that Congress was fully advised by the Department as to the meaning of the entire section, including the then existing interpretation of the custom-of-the-trade provision. The Department also recommended (1) repeal of the three commodity restriction and (2) repeal of the no-mixing rule, but (3) that "[n]o change need be made in the custom-of-the-trade provision." So when Congress followed the Department's recommendations by repealing the provisions the Department had recommended and *retaining* the custom-of-the-trade provision, the conclusion is almost irrebuttable that they intended the latter provision to continue to be interpreted in the manner in which Congress was advised in the report. We thus find no hint in the legislative history of any intent to alter the meaning of the custom-of-the-trade provision.[34]

---

**33.** *Id.* at 4.

**34.** The division did appear to reach such a conclusion, 351 I.C.C. at 427–32, but this position has been modified or abandoned by the Commission in its brief before this court, and in any event we find it to be without merit.

The division based its conclusion upon a broad reading of the legislative history of the 1973 amendment. First, it surmised that the general purpose of the amendment was to free water carriers generally from burdensome ICC regulation. Second, it concluded that DOT, and therefore the Congress, had only one immediate reason for retaining the custom-of-the-trade provision: "as the easiest method of continuing the regulation of sugar." 351 I.C.C. at 431. This conclusion was based upon the statement in the DOT Report that "sugar is the only commodity moving in *significant quantities* on the inland waterways that would be affected by dropping" the provision, DOT Report, *supra* note 9, at V–A.1, *quoted in* text at note 25, *supra* (emphasis added). The division also drew support from the identical statements made by DOT representatives at the Senate and House hearings inaccurately summarizing the DOT Report by stating that sugar was the "only commodity" that would be affected:

> The Custom-of-the-Trade Provision has been enforced since its enactment. However, dry bulk commodity carriers and shippers have, at least to date, experienced little practical difficulty living with it because sugar is the *only* commodity presently affected. [Not only did the DOT Report imply that other commodities moved in "[in]significant quantities," but ICC testimony in the 1967 *House Hearings* affirmatively stated that *chemicals* were also affected. *See* note 18 *supra*.] Moreover, there are no other commodities, existing or expected from new technology, which we currently see being affect-

ed by this provision in the future. Sugar is a controlled commodity and our study concluded that any attempt to change only the inland water transportation conditions affecting its production, distribution, and marketing would be likely to result in a minimal impact on either the transportation efficiency or the consumer price of sugar.

1973 *Senate Hearing, supra* note 27, at 10 (statement of Robert H. Binder); 1973 *House Hearing, supra* note 27, at 16 (statement of John W. Snow) (emphasis added). Also *see* 1973 Senate Report, *supra* note 30, at 8, quoted in note 32 *supra*. The division therefore concluded that "the legislative history tips the scales in favor of a presumption of exemption," 351 I.C.C. at 432. As the Commission read this holding the division "decided that the legislative history *requires*" the use of a "methodology test." 41 Fed.Reg. 5166 (1976) (emphasis added). Aware that this conclusion would lead to the deregulation of sugar, the division simply made an "exception" for this commodity. We address this "exception" in text at notes 43–45 *infra*. For the moment, we conclude that the legislative history, including the statement quoted *supra* in this note, makes it clear that Congress entertained no such "general intent" to alter or override the meaning of the custom-of-the-trade provision. Rather, it intended simply to repeal the other two restrictions while leaving that provision intact. The DOT Report and representatives stated not that the provision should be retained in order to continue the regulation of sugar, but rather that the relatively insignificant effect of the provision did not justify its repeal at the time.

To the extent that the division concluded that the reinterpretation was required by the legislative history of the 1973 amendments, the Commission has wisely abandoned that position. Instead, it now argues that the reinterpretation is "not inconsistent" with the legislative history. ICC Brief at 18.

### III.

The legislative history of the 1970 and 1973 amendments, which left the 1940 Act's custom-of-the-trade provision intact, thus reveals that Congress did not intend thereby to change the meaning of that provision. Petitioner and intervenor further contend that in reenacting this provision without change, Congress has precluded a subsequent change in the administrative interpretation of that provision.

█ The Supreme Court has indicated that in order to bring this "doctrine of reenactment" into play, Congress must not only have been made aware of the administrative interpretation, but must also have given some "affirmative indication" of such intent.[35] The legislative history of the two amendments, discussed in the previous part of this opinion, leaves no doubt that Congress was well aware of the Commission's longstanding interpretation of the custom-of-the-trade provision. Both the Commission and the Department of Transportation, in their numerous communications with the Senate and House committees and subcommittees, repeatedly described this undisputed interpretation. The comments of both the Commission and the Department were included in the 1973 Senate Report, the only report on the enacted legislation. The question of affirmative intent, however, requires further analysis.

While the Supreme Court has declined to hold that reenactment of a statute precluded a subsequent reinterpretation where there was not "the slightest affirmative indication" of such intent, *Commissioner v.*

Glenshaw Glass Co.*, 348 U.S. 426, 431, 75 S.Ct. 473, 99 L.Ed. 483 (1955), it has been willing in appropriate cases to infer such intent from the legislative history of the subsequent legislation. For example, in *United States v. Leslie Salt Co.*, 350 U.S. 383, 76 S.Ct. 416, 100 L.Ed. 441 (1956), the Commissioner of Internal Revenue sought to apply to certain corporate promissory notes a stamp tax applicable only to "debentures." Prior to that time, the Commissioner had consistently considered notes of the type in issue not to be "debentures," and moreover, a similar tax applicable to promissory notes had been repealed by Congress some years earlier. The Court struck down the Commissioner's reinterpretation of the term, concluding that the Commissioner's "original interpretation has had both express and implied congressional acquiescence, through the 1918 amendment to the statute  .  .  .  and through Congress having let the administrative interpretation remain undisturbed for so many years." [36]

█ In the present case, the legislative history of the two amendments clearly shows that Congress, well aware of the Commission's longstanding and unquestioned interpretation of the custom-of-the-trade provision, expressly rejected the Commission's repeated pleas that the provision be repealed. Congress thus not only expressed its satisfaction with the prior interpretation, but affirmatively concluded that it should not be changed for the time being, whether to assure that particular commodi-

---

**35.** *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431–32, 75 S.Ct. 473, 99 L.Ed. 483 (1955). *Accord, NLRB v. Seven-Up Bottling Co. of Miami*, 344 U.S. 344, 350–52, 73 S.Ct. 287, 97 L.Ed. 377 (1953); *Interstate Drop Forge Co. v. Commissioner*, 326 F.2d 743, 746 (7th Cir. 1964); *International Bhd. of Operative Potters v. NLRB*, 116 U.S.App.D.C. 35, 38, 320 F.2d 757, 760 (1963); *NLRB v. A.P.W. Products Co.*, 316 F.2d 899, 904–05 (2d Cir. 1963). *Cf. Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260, 265–66 n. 5, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); *Gulf Canal Lines v. United States*, 258 F.Supp. 864, 873 (S.D.Tex.1966), *affd. mem.*, 386 U.S. 348, 87 S.Ct. 1161, 18 L.Ed.2d 98 (1967).

**36.** 350 U.S. at 396–97, 76 S.Ct. at 424. *Accord, Helvering v. R. J. Reynolds Tobacco Co.*, 306 U.S. 110, 116–17, 59 S.Ct. 423, 83 L.Ed. 536 (1939). *Cf. Udall v. Tallman*, 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Johnson v. Manhattan Ry.*, 289 U.S. 479, 497–500, 53 S.Ct. 524, 77 L.Ed. 1467 (1933); *McCaughn v. Hershey Chocolate Co.*, 283 U.S. 488, 492–93, 51 S.Ct. 510, 75 L.Ed. 1183 (1931); *New York, N. H. & H. R. R. v. ICC*, 200 U.S. 361, 401–02, 26 S.Ct. 272, 50 L.Ed. 515 (1906) (agency's refusal to change longstanding interpretation supported by reenactment in the interim).

ties continued to be regulated [37] or simply to avoid too quickly making changes in the regulation of water carriers. On the basis of this legislative history, we conclude that Congress in 1970 and 1973 affirmatively intended to adopt the Commission's well established interpretation of that provision. The Commission was thus precluded in 1975 from radically changing its interpretation of that provision.[38]

## IV.

In the alternative, we conclude that the proper meaning of the custom-of-the-trade provision is established by the context of the provision in the Act itself. Additionally, we regard the ICC's longstanding interpretation of the provision as some evidence of its proper interpretation.

First, we note that the Commission's revised interpretation of the provision would render it meaningless. Apart from the "grandfather clause" here in issue, the custom-of-the-trade provision is limited in its application to "commodities in bulk which are . . . loaded and carried without wrappers or containers and received and carried without transportation mark or count." In view of the reasonable meaning of this language and the history of the Act, the Commission has consistently interpreted

it to refer to "fungibles, which can be poured, scooped, or shoveled, and which generally are of such a size that they cannot be handled by the piece." [39] Such commodities are not tallied by the piece, but constitute "a loose mass which is poured or thrown into a vessel or vehicle without regard to order, and which is restrained during transportation only by the bottom and sides of the carrying vessel and its bulkheads." [40] This interpretation is eminently reasonable, and the Commission has not suggested that it has been or should be changed in any way.

The reinterpretation of the parenthetical limitation that the Commission now urges would exempt from regulation any bulk commodity now carried in the same manner as bulk commodities were carried on June 1, 1939. The Commission has not suggested that bulk commodities on that date were handled other than by being "poured, scooped, or shoveled" into vessels or vehicles in which they were "restrained during transportation only by the bottom and sides of the carrying vessel," and without containers, mark or count. Nor has the Commission suggested that any "bulk" commodity presently in existence or foreseeable would be carried in any other way.[41] Thus,

---

37. *See* text at notes 43–45 *infra*.

38. The cases upon which the Commission relies were based upon a much weaker showing of congressional intent to adopt a prior administrative interpretation. *See, e. g., Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955) (discussed in text at note 35 *supra* ); *Girouard v. United States*, 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946) (subsequent legislative action found to *support* changed interpretation); *Helvering v. Reynolds*, 313 U.S. 428, 432–33, 61 S.Ct. 971, 85 L.Ed. 1438 (1941) (distinguishing *Helvering v. R. J. Reynolds Tobacco Co., supra* note 36, on the ground that the regulation there had "remained outstanding for a long time and was followed by several reenactments of the statute").

39. *John J. Mulqueen Contract Carrier Application,* 250 I.C.C. 436, 439 (1942).

40. *John L. Goss Corp. Contract Carrier Application,* 250 I.C.C. 101, 103 (1941) *affd. on rehearing,* 250 I.C.C. 485 (1942). *Accord, Union Barge Line v. Rose Barge Line,* 292 I.C.C. 681 (1954), *affd. mem. sub nom. V. P. Serodino, Inc. v. United States,* 350 U.S. 961, 76 S.Ct. 434, 100 L.Ed. 835 (1956). *See* 2 DOT Report, *supra* note 9, at App. C.3–C.5.

41. The division does recognize this problem:

The next question might properly be why this additional modification would be necessary (unless a general attempt to enumerate commodities) when the main thought appears to tell the method of handling bulk commodities. At least two reasons appear plausible. First, it might prevent an exotic argument that some new (or unusual) technique might be considered a bulk loading technique where nobody in the trade would so consider it, or that such a technique converted what was commonly considered "merchandise" into a bulk commodity. Second, it might prevent consideration of what was commonly handled as and considered in the trade as a bulk commodity in accordance with some strained interpretation of the definition in the main thought.

by reading the parenthetical phrase within the custom-of-the-trade provision to relate only to "methodology," the Commission extends the provision to include *all* bulk commodities, as defined by section 303(b), and thus renders the parenthetical limitation surplusage. "This construction, therefore, offends the well-settled rule that all parts of a statute, if at all possible, are to be given effect."[42] The Commission's attempted reinterpretation would accomplish by administrative fiat what it failed to accomplish through the Congress.

Next, we can divine no rational basis for the distinction drawn by the Commission between sugar, which it continues to find within its regulatory jurisdiction, and other commodities not actually carried "in bulk . . . without wrappers or containers" on June 1, 1939. The Commission concedes that sugar was carried in sacks on that date, and that this does not qualify within the meaning of section 303(b).[43] However, since the legislative history of the 1973 amendment indicated that sugar was subject to ICC regulation,[44] the division concluded that sugar must continue to be regulated:

> It is obvious, however, that for other reasons Congress wished sugar to remain regulated. In this one case, we will adhere to the specific intent of Congress, rather than reasoning from its general intent. Although under the more logical interpretation of its general intent under

section 303(b) we might have considered sugar as now exempt if handled in bulk in the appropriate manner, the specific intent of Congress concerning the regulation of this commodity obviously must take precedence.[45]

But there is no question that sugar is at *present* handled in bulk *in the same manner* as other commodities were handled in bulk on June 1, 1939. The Commission has thus offered no explanation in terms of methodology for its different treatment of sugar, much less a colorably rational explanation. Even if the Commission's reinterpretation of the custom-of-the-trade provision were rational in the abstract, its exclusion of sugar without any rational explanation at all in terms of the very basis of the construction it has adopted would render the Commission's order arbitrary and capricious. Indeed, it is difficult to conceive how any rational distinction could be drawn on this ground between bulk sugar and other bulk commodities.

Finally, we note that the Congress in enacting the 1940 Act was perfectly capable of speaking clearly when it intended to refer to the "inherent nature" of commodities, rather than to particular commodities handled "in bulk" as of a specific date. Section 303(e)(2) grants to the Commission the power, upon application and subject to conditions, to exempt from regulation

> in addition to the transportation otherwise excluded under this section, trans-

---

351 I.C.C. at 433–34. However, we find both of these hypothetical explanations unpersuasive.

**42.** *Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 633, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973). *Accord, Administrator, FAA v. Robertson*, 422 U.S. 255, 261, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975); *United States v. Campos-Serrano*, 404 U.S. 293, 300–01, 92 S.Ct. 471, 30 L.Ed.2d 457 (1971); *Montclair Twp. v. Ramsdell*, 107 U.S. (17 Otto.) 147, 153, 2 S.Ct. 391, 27 L.Ed. 431 (1883).

**43.** *Cf. G. B. Zigler Co. Contract Carrier Application*, 265 I.C.C. 404, 406 (1948), *modified on*

*other grounds*, 265 I.C.C. 539 (1949); *John J. Mulqueen Contract Carrier Application*, 250 I.C.C. 436, 438–39 (1942); *Atawacoal Transp. Co.—Exemption, Section 303(e)*, 250 I.C.C. 33, 39 (1941). *See* DOT Report, *supra* note 9, at App. C.5.

**44.** *See* note 34 *supra*.

**45.** 351 I.C.C. at 434 n. 17.

portation by contract carriers by water which, by reason of the *inherent nature* of the commodities transported, their requirement of special equipment, or their *shipment in bulk*, is not actually and substantially competitive with transportation by any common carrier subject to this part or part I or part II.[46]

This discretionary exemption is drafted in terms that leave no doubt that its applicability depends on the *manner* of carriage and the characteristics of the commodity, and not on whether it was the custom of the trade to carry a particular commodity in a given way at a particular date. This supports the conclusion that the parenthetical phrase in section 303(b), which specifies a precise date, was meant to exempt only the specific commodities so carried on that date.

For all of the foregoing reasons, we conclude that the Commission's attempted reinterpretation of the custom-of-the-trade provision to exclude the intent plainly expressed by inclusion of the specific date is arbitrary and capricious and contrary to the meaning of section 303(b).

*Vacated and Remanded.*

---

**46.** Transportation Act of 1940, Pub.L. No. 76–785, § 201, 54 Stat. 932, *as codified*, 49 U.S.C. § 903(e)(2) (1970) (emphasis added).