865 F.2d 468
 24 Soc.Sec.Rep.Ser. 251, Medicare&Medicaid Gu 37,621
George H. ISAACS, Frank Pavano, James Agalloco, Abraham
Frosch, on Behalf of Themselves and all Others
Similarly Situated, Plaintiffs-Appellants,
v.
Otis R. BOWEN, as Secretary of the Department of Health and
Human Services and William Roper, as Administrator
of Health Care Financing Administration,
Defendants-Appellees.
 No. 28, Docket 88-6100.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 29, 1988.
Decided Jan. 4, 1989.
 
 Whitney North Seymour, Jr., New York City (Craig A. Landy, Brown & Seymour, New York City, of counsel), for plaintiffs-appellants.
 Chad A. Vignola, Sp. Asst. U.S. Atty., S.D.N.Y. (Edward T. Ferguson, III, Asst. U.S. Atty., Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., of counsel), for defendants-appellees.
 Sally Hart Wilson, Los Angeles, Cal. (Neal S. Dudovitz, Nat. Senior Citizens Law Center, Los Angeles, Cal.; Alfred J. Chiplin, Jr., Nat. Senior Citizens Law Center, Washington, D.C., of counsel), filed a brief on behalf of Gray Panthers Advocacy Committee as amicus curiae.
 Constance P. Carden, Legal Services for the Elderly, New York City; Brookdale Center on Aging Institute on Law and Rights of Older Adults, New York City, filed a brief on behalf of Statewide Senior Action Council, Brookdale Center on Aging Institute on Law and Rights of Older Adults as amici curiae.
 Before FEINBERG, Chief Judge, CARDAMONE and PRATT, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This is an appeal from a judgment entered on April 29, 1988 in the United States District Court for the Southern District of New York (Knapp, J.), that granted the motion of the Secretary of Health and Human Services, defendant-appellee Otis R. Bowen, to reargue, vacated a previously issued injunction, and dismissed class action plaintiffs-appellants, George H. Isaacs' amended complaint. See Isaacs v. Bowen, 683 F.Supp. 930 (S.D.N.Y.1988). The district court reversed itself prompted by a belief that Congress had altered its view concerning one part of the Medicare Act. We agree that, though an unbending legislative constancy is not presumed, more is required than a mere belief that it is in the nature of all things to change for us to conclude that Congress has changed its mind. Whether an administrative interpretation of the Medicare Act has been adopted by Congress--the principal issue before us--requires careful legal analysis of Congress' actions.
 
 PRIOR LEGAL PROCEEDINGS
 
 2
 Appellants bring suit under the Part B claims reimbursement program of the Medicare Act, 42 U.S.C. Secs. 1395j-1395w (1983 & Supp. III 1985). They contend that recent regulations promulgated by the Secretary exceed his statutory authority, and that the new regulations deny them their due process rights because Part B beneficiaries must in some cases undergo the expense and delay of an administrative "fair hearing" prior to obtaining statutory review by an Administrative Law Judge (ALJ). Appellants also claim that a proposal by the Health Care Financing Administration (Financing Administration) to substitute an "in-house" Medicare ALJ unit in place of existing Social Security ALJs violates the language and intent of the 1986 amendments to the Medicare Act. See Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99-509, Sec. 9341, 100 Stat. 2037 (1986) (1986 Amendments), amending Title XVIII of the Social Security Act, 42 U.S.C. Sec. 1395 et seq. (1982) (the Medicare Act).
 
 
 3
 The district court initially determined that the 1986 Amendments to the Part B reimbursement process evinced Congress' intent to eliminate fair hearings prior to ALJ review in actions involving more than $500. It then ruled that a prerequisite fair hearing (before ALJ review could be had), required by the Medicare Carrier Manual (Medicare Manual) Sec. 12015B, violated those amendments. Thus, it granted plaintiffs' motion for summary judgment, enjoined implementation of Sec. 12015B, and dismissed plaintiffs' other two claims. See 683 F.Supp. at 933-34.
 
 
 4
 The Secretary moved for reargument on the basis of certain actions by Congress. While the questions originally presented to the district court were sub judice, see 683 F.Supp. at 934-95, Congress passed the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100-203, 101 Stat. 1330 (1987) (1987 Amendments). That Act reworded the statute eliminating the "not more than $500" language and substituting in its place the phrase "less than $500." Congress also authorized the General Accounting Office (GAO) to conduct a cost-effectiveness study of the existing claims-reimbursement procedures, including the Sec. 12015B requirement that claims of more than $500 receive a "fair hearing" prior to ALJ review. These two actions by Congress, together with its hearings on Part B and other Medicare issues, led the district court to vacate its prior disposition of the case and to dismiss plaintiffs' entire complaint. See 683 F.Supp. at 935. This appeal followed. We affirm.
 
 DISCUSSION
 
 5
 * A. Medicare Part B Reimbursement Procedure
 
 
 6
 We begin by examining the statutory framework of the Medicare Part B reimbursement procedures. The Medicare Act is composed of two separate benefits programs. The primary benefits component--with which this case is only tangentially concerned--is Part A. See 42 U.S.C. Secs. 1395c-1395i. Funded by Social Security taxes, Part A provides major medical coverage for hospital care and related post-hospitalization services. Part B, the subject of this appeal, is a federally subsidized voluntary health insurance program designed to supplement Part A coverage for persons 65 years of age or older, and for disabled persons. See 42 U.S.C. Secs. 1395j-1395w. Part B insures against some medical expenses not included in Part A's coverage. Eligible participants in the Part B program pay periodic premiums which, together with contributions from the federal government, are deposited in the Federal Supplementary Insurance Trust Fund that finances the Part B program. See 42 U.S.C. Secs. 1395l, 1395r, 1395t, 1395w.
 
 
 7
 The Secretary administers Parts A and B of the Medicare programs. Under Part B he is authorized to assign to private insurance carriers the task of paying Part B claims from the Trust Fund. See 42 U.S.C. Sec. 1395u(a) (authority is given "to provide for administration of benefits ... with maximum efficiency and convenience for individuals entitled to benefits...."). After receiving medical care or services, Part B enrollees make a claim against their private carriers. Under standards set forth in the Medicare Act and regulations promulgated by the Financing Administration (the agency within the Department of Health and Human Services that administers Medicare), the carriers review these claims to determine whether the services were "medically necessary," "reasonable," and otherwise payable under Part B. See 42 U.S.C. Sec. 1395u(b)(3); 42 C.F.R. Sec. 405.501 et seq. (1988); 42 C.F.R. Sec. 421.200 et seq. If the claim and claimant meet the applicable criteria, the carrier pays the claim with funds drawn from the Trust Fund. If a claim is denied or not reimbursed in full, a review process comes into play.
 
 
 8
 A dissatisfied claimant seeking review of the carrier's initial determination may "submit written evidence and contentions" in support of his or her claim. See 42 C.F.R. Sec. 405.809. The carrier must then conduct an internal paper review of its own determination. See 42 C.F.R. Sec. 405.810. If the claimant remains unsatisfied and the amount in controversy exceeds $100, he or she may seek further review. If the amount in controversy is "at least $100, but less than $500," review is limited to a "fair hearing" conducted by a hearing officer designated by the carrier. See 42 U.S.C. Sec. 1395u(b)(3)(C) (1987 Amendments) (emphasis added). It is the ambiguous nature of the review permitted for Part B claims of $500 or more that is the crux of this litigation.
 
 
 9
 B. Statutory and Regulatory Changes in 1986 and 1987
 
 
 10
 Prior to 1986 the Medicare Act required that claims contracts with private carriers provide for a fair hearing by the carrier "in any case where the amount in controversy is $100 or more." A fair hearing was the only review available to Part B claimants--regardless of the amount of the claim--and the determination of the fair hearing officer was final and unreviewable. See Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 678, 106 S.Ct. 2133, 2140, 90 L.Ed.2d 623 (1986) (Congress did not preclude challenges to the validity of regulations promulgated by Secretary); United States v. Erika, Inc., 456 U.S. 201, 206-08, 102 S.Ct. 1650, 1653-54, 72 L.Ed.2d 12 (1982) (noting that review of a fair hearing officer's determination as to entitlement or eligibility was not foreclosed). In contrast, Part A claims of $100 or more received direct ALJ review, and for claims of $1000 or more judicial review of an adverse ALJ decision, See 42 U.S.C. Sec. 1395ff(b)(2)(A).
 
 
 11
 Responding to dissatisfaction with the scheme of review under Part B and its asymmetry with Part A, Congress held hearings on the Medicare appeals process. Criticism by various groups was leveled at the perceived shortcomings of the Part B hearing scheme--particularly at the in-house relationship between fair hearing officers and the carriers that employed them--and the absence of review beyond the fair hearing stage. See Medicare Appeals Provisions: Hearing on S. 1158 Before the Subcomm. on Health of the Senate Comm. on Fin., 99th Cong., 1st Sess. 188-94 (1985) (statement of John H. Pickering on behalf of American Bar Association); id. at 229-33 (statement of Arlene Lapp, Medicare Part B participant); id. at 385-91 (statement of National Association of Medical Equipment Suppliers). These problems and Congress' solutions were noted in a House Report accompanying the final bill:
 
 
 12
 Numerous concerns have been expressed by beneficiaries about the fairness and adequacy of this Part B appeals process. Some have expressed the concern that the hearing officers are not properly qualified or are not objective, because many of them are former employees of the carrier or because their continued service as hearing officers may depend on the carriers' being satisfied with the decisions they render. Other concerns deal with the way hearings are conducted, including the beneficiaries' inability to produce evidence or to challenge the hearing officers' decision rules or his reliance on unidentified experts and consultants.
 
 
 13
 The Committee bill would attempt to resolve these concerns by establishing an appeals procedure under Part B that is modeled after that available under Part A. Review by an ALJ would be available if the amount in controversy were $500 or more and judicial review would be available if the amount in controversy were $1000 or more.
 
 
 14
 See H.R.Rep. No. 797, 99th Cong., 2nd Sess. 95, reprinted in 1986 U.S.Code Cong. & Admin.News 3607, 3685.
 
 
 15
 Ultimately Congress amended the Part B hearing process in two respects. First, it continued to require "fair hearings," but changed the amount in controversy requirement to include a maximum as well as a minimum. Carriers' contracts with beneficiaries were required to include that "an individual enrolled under this part will be granted an opportunity for a fair hearing by the carrier, in any case where the amount in controversy is at least $100, but not more than $500...." 42 U.S.C. Sec. 1395u(b)(3)(C). Second, Congress amended the Part B appeals process by adding review by an ALJ and the district court, providing "[a]n [ALJ] hearing shall not be available ... if the amount in controversy is less than $500 and judicial review shall not be available if the aggregate amount in controversy is less than $1000." 42 U.S.C. Sec. 1395ff(b)(2)(B).
 
 
 16
 In amending Part B, Congress failed to spell out whether a fair hearing was required for claims in excess of $500. Appellants argued strongly--and, at that point in time, cogently--that the language and legislative history of the Amendments evinced an aim to eliminate fair hearings in cases involving substantial amounts. In April 1987 the Financing Administration amended its Medicare Manual, which is its primary policy guide for private carrier claims procedures. A new Sec. 12015B was inserted which provided that "[t]he carrier fair hearing is a prerequisite for an ALJ hearing. If less than $500 is in controversy following the carrier hearing officer's decision, no further appeals are available." In other words, according to the Secretary, regardless of the amount in controversy a fair hearing is required by those making Part B claims before any other review is available. See 683 F.Supp. at 933 (citing Medicare Manual). The district court correctly enjoined implementation of this new Sec. 12015B, holding that Congress had not authorized the adding of another level of review. Instead, its purpose was to model Part B after Part A appeals, and to eliminate fair hearings for claims of $500 or more. See 683 F.Supp. at 933-34.
 
 
 17
 In December 1987 Congress held oversight hearings, took testimony, and enacted legislation governing Part B procedures. It had before it testimony given on October 7, 1987 by appellee Dr. William L. Roper, Administrator of the Health Care Financing Administration, before the House Subcommittee on Administrative Law and Governmental Relations. See Proposed New Administrative Appeals Process for Medicare Claims: Hearings Before the Subcomm. on Administrative Law and Governmental Relations of the House Comm. on the Judiciary, 100th Cong., 1st Sess. 7-22 (1987) (statement of William L. Roper, M.D.). Dr. Roper's testimony focused principally on the proposed creation of a Medicare ALJ unit. He also discussed the Part B appeals process, and noted that carrier hearings would continue. Congress thereafter enacted the 1987 Amendments, which concerned Part B procedures in two respects. First, Congress altered the phrasing of the statutory monetary ceiling for the granting of a fair hearing from "not more than [$500]" to "less than [$500]," describing these actions as "technical amendments." See 1987 Amendments, Pub.L. No. 100-203, Sec. 4085(i)(5), 101 Stat. 1330-132 (1987) (amending 42 U.S.C. Sec. 1395u(b)(3)(C)). Second, it authorized the GAO to conduct a cost-effectiveness study of the Financing Administration's uniform requirement of fair hearings prior to ALJ review. Id. at Sec. 4082(d).
 
 II Analysis of Issues
 A. The Doctrine of Legislative Reenactment
 
 18
 With this background in mind, we turn to an analysis of the arguments raised on appeal. Appellants' principal contention is that Congress planned to eliminate the carrier fair hearing requirement in cases involving more than $500, and that the Secretary's new Sec. 12015B set forth in the Medicare Manual is inconsistent with the Act and its Amendments, and should therefore be enjoined. Were it not for the 1987 Amendments, this argument would carry the day on appeal, just as it did at first in the district court. Appellants' additional argument that the 1987 Amendments and the GAO study provisions were not intended to make any substantive change--or to ratify or even tacitly accept the Financing Administration's unilateral decision to add another level of review to the Congressional scheme--is one we cannot adopt.
 
 1. Formulation of the Doctrine
 
 19
 Courts are often faced with questions of whether agency action is consistent with its statutory mandate. In the usual sequence of events Congress authorizes administrative action, the agency promulgates regulations, and the regulations are then challenged in federal court. In such situations, the analytical framework is clear. Encountering a "pure question" of statutory construction, "the judiciary is the final authority ... and must reject administrative constructions which are contrary to clear congressional intent." See Chevron U.S.A. v. Natural Resources Defenses Council, Inc., 467 U.S. 837, 843-44, n. 9, 104 S.Ct. 2778, 2781-82, n. 9, 81 L.Ed.2d 694 (1984). When an agency is required to apply a legal standard to a particular set of facts, or when Congress has left a gap, or has not directly addressed the subject at issue, a court accepts the construction of a statute posited by the agency Congress has charged to administer it. See I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 448, 107 S.Ct. 1207, 1221-22, 94 L.Ed.2d 434 (1987).
 
 
 20
 The sequence of events in the present case defies this evident--but sometimes difficult to apply--analysis. Absent the 1987 Amendments, the language and legislative history of the 1986 Amendments indicate that Congress aimed to eliminate fair hearing procedures when the amount in controversy exceeded the newly-inserted $500 statutory ceiling. Yet, because the 1987 Amendments were enacted subsequent to the promulgation of Sec. 12015B, we must focus instead on whether Congress by its actions ratified or "reenacted" the regulations challenged on this appeal.
 
 
 21
 We have addressed the so-called "doctrine of legislative reenactment" only briefly, and not in those words. See, e.g., Bell Aerospace Co. v. N.L.R.B., 475 F.2d 485, 493-94 (2d Cir.1983), aff'd in part, rev'd in part, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). Its pedigree goes back at least 80 years. See United States v. Falk, 204 U.S. 143, 152, 27 S.Ct. 191, 195, 51 L.Ed. 411 (1907). The rule was formulated in these words: "The re-enactment by Congress, without change, of a statute, which had previously received long-continued executive construction, is an adoption by Congress of such construction." United States v. Hermanos y Campania, 209 U.S. 337, 339, 28 S.Ct. 532, 533, 52 L.Ed 821 (1908). The doctrine provides that congressional reenactment of a statutory provision underlying or putatively authorizing an administrative regulation gives the agency interpretation the force and effect of law. See, e.g., United States v. Board of Comm'rs, 435 U.S. 110, 134, 98 S.Ct. 965, 980, 55 L.Ed.2d 148 (1978); A.F.L.-C.I.O. v. Brock, 835 F.2d 912, 915-16 (D.C.Cir.1987); Casey v. Commissioner, 830 F.2d 1092, 1095 (10th Cir.1987); International Union, U.A.W. v. Brock, 816 F.2d 761, 767 (D.C.Cir.1987); McCoy v. United States, 802 F.2d 762, 764 (4th Cir.1986); Association of Am. R.R.'s v. ICC, 564 F.2d 486, 493 (D.C.Cir.1977).
 
 
 22
 A recent statement of the basic doctrine is that when the agency charged with the implementation of a statute has purported to interpret it by promulgating regulations, and Congress--without overruling or clarifying the agency's interpretation--later amends the statutory scheme, the agency view is then deemed consistent with Congress' objectives. Casey, 830 F.2d at 1095. Although accurate, this formulation does not adequately define the contours of the doctrine, which the Supreme Court expressed in this fashion: "[w]hen a Congress that re-enacts a statute voices its approval of an administrative or other interpretation thereof, Congress is treated as having adopted that interpretation, and this Court is bound thereby." United States v. Board of Comm'rs, 435 U.S. at 134, 98 S.Ct. at 980. This suggests that a test is required to ascertain whether Congress has spoken clearly enough to constitute acceptance and approval of the administrative interpretation. Mere reenactment is insufficient. It must also appear that Congress expressed approval of the agency interpretation. That is to say, the doctrine applies when Congress indicates not only an awareness of the administrative view, but also takes an affirmative step to ratify it. See A.F.L.-C.I.O. v. Brock, 835 F.2d at 915; U.A.W. v. Brock, 816 F.2d at 767; Association of Am. R.R.'s, 564 F.2d at 493. In short, to construe an agency's interpretation as Congress' will we must find a manifestation of congressional approval.
 
 2. Application of the Doctrine
 
 23
 Appellants raise several arguments against applying the doctrine of reenactment in the instant case. They urge, first, that the amendment that changed the amount in controversy ceiling from "not more than $500" to "less than $500," was a minor technical amendment. The amending section is, in fact, entitled "Miscellaneous and Technical Provisions." See 1987 Amendments, Sec. 4085. The substantive effect is to alter the ceiling by a single dollar. Plainly, that is not the kind of deliberative legislative action that binds a court under the doctrine of legislative reenactment. Yet, insistence that this was a minor, technical amendment misses the point. By amending Sec. 1395u(b)(3)(C)--the amount in controversy provision--Congress demonstrated its awareness of the agency interpretation. Further, the importance of the change is not in its substantive effect, but its evidentiary significance; that is, by not using the opportunity when amending the section to address the agency's interpretation, Congress must be presumed to have considered and approved the implementing regulations.
 
 
 24
 Next, appellants insist, the GAO-directed study was a last minute addition to the 1987 Amendments, without benefit of legislative hearings, and indicates Congress' concern rather than its approval of the agency's fair hearing scheme. See 1987 Amendments, Sec. 4082(d). We cannot agree. Not only did Congress alter Sec. 1395u(b)(3)(C), it also authorized the GAO to study the cost-effectiveness of "the current requirement for carrier hearings prior to a hearing before an [ALJ]." 133 Cong.Rec. 12,286 (daily ed. December 21, 1987). Section 4082(d) of 1987 Amendments provides that:
 
 
 25
 The Comptroller General shall conduct a study concerning the cost-effectiveness of requiring hearings with a carrier under Part B ... before having a hearing before an Administrative Law Judge.... The Comptroller General shall report to the Congress on the results of such study by not later than June 30, 1989.
 
 
 26
 Pub.L. No. 100-203, Sec. 4082(d), 101 Stat. 1330-132 (1987). Thus, the plain language of Sec. 4082(d) reveals Congress' plan to retain and study the agency's decision to add another level of review. Congress' request for the GAO study, therefore, significantly undermines appellants' argument.
 
 
 27
 Finally, appellants contend that the doctrine of legislative reenactment is unwarranted because the regulations at issue are not "longstanding," and Congress' actions do not imply "widespread congressional awareness." See, e.g., SEC v. Sloan, 436 U.S. 103, 121, 98 S.Ct. 1702, 1713, 56 L.Ed.2d 148 (1978). The Supreme Court has cautioned that courts must be "extremely hesitant to presume general congressional awareness of the ... [agency's] construction based only upon a few isolated statements in thousands of pages of legislative documents." See id. Additionally, the Court has further held that the legislative history of a reenactment must show express approval of a longstanding administrative interpretation for it to be treated as ratified by Congress. See United States v. Board of Comm'rs, 435 U.S. at 135, 98 S.Ct. at 981.
 
 
 28
 Thus, Congress' awareness and the longevity of the administrative position must be addressed. We think Congress exhibited adequate awareness of the Secretary's scheme and gave an affirmative, legislative indication of its willingness to leave the fair hearing prerequisite in place, at least until the GAO study is completed. Awareness is ascertainable from Dr. Roper's October 1987 congressional testimony. In his capacity as the Administrator of the Financing Administration, he discussed the agency's proposed creation of an in-house Medicare ALJ unit. See Medicare Hearings, supra, at 7-22, 28-42. He also discussed the agency's decision to continue carrier fair hearings, acknowledged criticism of that decision and attempted to justify it. See id. at 13. Specifically, Dr. Roper acknowledged that critics believed that the hearings merely created more delay in the Part B claims reimbursement process. Hence, the broad issue of Medicare appeals was before Congress. Congress' attention was drawn particularly to the fair hearing prerequisite, criticisms concerning the Secretary's regulations and the agency's decision to include fair hearings. See Medicare Hearings, at 62 (statement of Sally Hart Wilson, Esq., National Senior Citizens Law Center, criticizing Secretary's decision to include fair hearing prerequisite after the 1986 Amendments).
 
 
 29
 Concededly, testimony before a congressional subcommittee is not alone sufficient to "presume general congressional awareness of [an agency's] construction," Sloan, 436 U.S. at 121, 98 S.Ct. at 974. But amendment of the specific provision at issue "without pertinent change" is "an additional indication of more widespread congressional awareness." See Sloan, 436 U.S. at 121-22, 98 S.Ct. at 974; NLRB v. Bell Aerospace Co., 416 U.S. 267, 274-75, 94 S.Ct. 1757, 1761-62, 40 L.Ed.2d 134 (1974) (a court may give great weight to the longstanding interpretation of a statute by the administrating agency, "especially ... where Congress has re-enacted the statute without pertinent change"). We are satisfied therefore that the record demonstrates congressional awareness at the time of reenactment.
 
 
 30
 We now consider the longevity of the agency interpretation. Admittedly, most of the cited cases deal with "longstanding" administrative interpretations of the organic statute. See, e.g., Bell Aerospace Co., 416 U.S. at 274-78, 94 S.Ct. at 1761-64; Casey, 830 F.2d at 1094-95 (Congress' acceptance of an Internal Revenue regulation unchanged from 1964 to 1979, despite amendment of the underlying provision, constitutes its acceptance of the administrative regulation); cf. Association of Am. R.R.'s, 564 F.2d at 493 (ICC order changing a 35-year old interpretation of an exemption in the Interstate Commerce Act held to be arbitrary and capricious because Congress by reenacting the exemption as it stood two years before the ICC change had expressed approval and unwillingness to alter the prior interpretation.).
 
 
 31
 Despite these decisions, the touchstone of reenactment is not time. Duration is particularly helpful when Congress is silent, because the passage of time may elevate congressional inaction into approval. In other words, longevity merely has evidentiary significance for discerning Congress' appreciation of the agency's actions. The basic requirement for the application of the doctrine remains congressional awareness coupled with meaningful action aimed at the agency's interpretation. See A.F.L.-C.I.O. v. Brock, 835 F.2d at 915; U.A.W. v. Brock, 816 F.2d at 767; Association of Am. R.R.'s, 564 F.2d at 493. We think such meaningful action is present here.
 
 
 32
 Congress heard testimony concerning the Finance Administration's decision to add fair hearings in cases where they may not have been required or even permissible. Instead of reversing this administrative decision contained in Sec. 12015B, Congress amended the amount in controversy provisions for Part B hearings and authorized a study of the cost-effectiveness of the scheme. From this we find a visible expression of congressional approval of the agency's position. As a consequence, we conclude that Congress has ratified Medicare Manual Sec. 12015B.
 
 B. Due Process Arguments
 
 33
 Appellants also argue that the "additional" fair hearing prior to ALJ review creates unreasonable delay in the Part B reimbursement process which violates their due process rights. The Supreme Court has already upheld the constitutionality of the fair hearing in its pre-1986 form. See Schweiker v. McClure, 456 U.S. 188, 195-98, 102 S.Ct. 1665, 1669-72, 72 L.Ed.2d 1 (1982). In McClure, Part B claimants asserted that fair hearings were not sufficiently impartial to comport with due process because the fair hearing officers had a pecuniary interest in being retained by the carrier for future hearings, and because many hearing officers had been employed previously by the carriers. Yet, the Court held that the scheme created by statute and regulation were sufficiently impartial to accord with due process. Id. at 196-97, 102 S.Ct. at 1670-71.
 
 
 34
 Appellants' argument focuses entirely on the delay created by the "two-tier" approach to Part B claims. The exact length of that delay is difficult to ascertain. The GAO cost-effectiveness study will at least tangentially address the time span. Appellants suggest that the time between initiation of a claim and completion of an ALJ hearing could be as much as 19 months. They attribute six months to internal carrier review, four to six months for a fair hearing (the Financing Administration's estimated processing time for carrier fair hearing decisions was 131 days in fiscal year 1986), and six or seven months to complete ALJ review. Hence, a total of 19 months seems a fair estimate with perhaps six months of that time being attributable to the fair hearing.
 
 
 35
 The Supreme Court has emphasized that due process is not a static technical concept "with a fixed content unrelated to time, place and circumstances." Mathews v. Eldridge, 24 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1975) (quoting Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)). When, for example, government benefits or entitlements are conditioned upon financial need due process concerns are of correspondingly greater weight. See, e.g., Eldridge, 424 U.S. at 342, 96 S.Ct. at 906; Goldberg v. Kelly, 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970); Kraemer v. Heckler, 737 F.2d 214, 221 (2d Cir.1984). In Goldberg the Court held that due process required that a welfare recipient be afforded "an evidentiary hearing before the termination of benefits," because "termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits." Goldberg, 397 U.S. at 260, 264, 90 S.Ct. at 1016, 1018 (emphasis in original). Unlike the welfare assistance in Goldberg, Medicare benefits are not based on financial need. See Eldridge, 424 U.S. at 340, 96 S.Ct. at 905. ("eligibility for disability benefits ... is not based upon financial need."); Kraemer, 737 F.2d at 221 ("medicare payments ... are not conditioned upon financial need.").
 
 
 36
 In cases like this one--where benefits are not based upon one's means--the balancing test set forth in Eldridge is appropriate. The three factors that must be balanced are: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value of additional or substitute procedural safeguards; and (3) the fiscal and administrative burdens that the additional or substitute procedures entail. 424 U.S. at 335, 96 S.Ct. at 903.
 
 
 37
 The first two factors--the private interest affected and the risk of absolute deprivation of that interest--are the focus of appellants' claim. Their private interest lies in the prompt and fair reimbursement of medical expenses covered by Part B. Those expenses must exceed $500, which is a considerable sum for many of the perhaps 30 million Part B participants. Obviously, their private interests are more acutely affected the longer reimbursement is withheld. Because of the high cost of medical care generally, the interest affected here weighs more heavily than other private interests might. Still, "the private interest at stake is not overwhelming." McClure, 456 U.S. at 194, 102 S.Ct. at 1669. As noted, Part B benefits are not based on financial need, and therefore the risk of government-created indigency is small. Moreover, Part B covers supplementary medical services, not those primary services covered by Part A. The statutory framework of the Medicare Act has always reflected this difference by permitting immediate ALJ review--without a fair hearing requirement--for Part A claims of $100 or more. See 42 U.S.C. Sec. 1395ff(b)(2); United States v. Erika, Inc., 456 U.S. at 206-08, 102 S.Ct. at 1653-54.
 
 
 38
 Finally, most Part B claims are brought not by beneficiaries but by physicians to whom such claims are statutorily assigned under Sec. 1395u(b)(3)(B). Certainly physicians have important interests at stake, and perhaps not all of them are satisfied with the operation of Part B. See, e.g., K. Prager, Medicare Meddling, N.Y. Times, Sept. 12, 1988, at A26, Col. 1. Nonetheless, our principal concern is with the interests of Part B beneficiaries. We recognize that appellants' interest may be "considerable," but they are hardly as significant, for example, as an individual's right to receive welfare.
 
 
 39
 Moreover, we may assume that the risk of absolute and erroneous deprivation of prompt reimbursement is increased by the two-tier approach. Yet the record does not help us gauge how much. Appellants insist only that the fair hearing prerequisite drains claimants' resources. Underlying their legal contention of a constitutionally unreasonable delay is the persistent intimation that the fair hearing process is a meaningless procedural hurdle instituted to discourage claimants from pursuing review. This assertion essentially is that the longer reimbursement takes, the less likely it is that a claimant will pursue a claim. In view of the Supreme Court's teachings in McClure and the approved use of fair hearings by Congress, we are unable to accept that view.
 
 
 40
 The last Eldridge factor requires consideration of the fiscal and administrative burdens that substitute procedures would impose upon the government. See 424 U.S. at 335, 96 S.Ct. at 903. Typically, most litigants want more process--such as the welfare benefit pretermination hearing sought in Goldberg--not less. In Eldridge the Court held that due process did not require an evidentiary hearing prior to termination of disability benefits. Id. at 349, 96 S.Ct. at 909-10. Here, in contrast, appellants want the fair hearing eliminated, presumably because claims reimbursement would be expedited by direct ALJ review. Removal of the fair hearing would doubtless impose heavy costs on the government. Fair hearings provide reimbursement in almost two-thirds of the claims, and are faster and less expensive than full-blown ALJ review. When McClure was decided in 1982, approximately 27 million people participated in Part B programs. See 456 U.S. at 190, 102 S.Ct. at 1667. Hence, the government's interest in speed and efficiency is real and substantial.
 
 
 41
 Regrettably, delay is a natural concomitant of our administrative bureaucracy. Neither the six-month delay created by the additional fair hearing, nor the estimated total of 19 months from claim initiation to completion of ALJ review are remarkable in the Medicare, Social Security and employment benefits systems. See Littlefield v. Heckler, 824 F.2d 242, 247 (3d Cir.1987) (nine month delay between decision of ALJ and final decision of Appeals Council not violative of due process); Givens v. United States R.R. Retirement Bd., 720 F.2d 196, 201 (D.C.Cir.1983) (19 month delay in processing claim for retirement benefits not violative of due process), cert. denied, 469 U.S. 870, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984); cf. Frock v. United States R.R. Retirement Bd., 685 F.2d 1041, 1047 n. 13 (7th Cir.1982) (two year delay held constitutional), cert. denied, 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983).
 
 
 42
 Of course delay can be so unreasonable as to deny due process, such as when it is inordinately long or when a recipient demonstrates immediate financial need. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 547, 105 S.Ct. 1487, 1496, 84 L.Ed.2d 494 (1985) ("At some point, a delay in the post-termination hearing would become a constitutional violation"); Eldridge, 424 U.S. at 342, 96 S.Ct. at 906 (recipients not showing immediate need not be denied due process by lack of hearing and delay of 19 months between benefits cutoff and final decision); Kelly v. Railroad Retirement Bd., 625 F.2d 486, 490 (3d Cir.1980) (three year and nine month delay in processing disability application held unconstitutional). Here the delay is not inordinately long and Part B beneficiaries do not face immediate financial hardship from awaiting reimbursement. Accordingly, the district court properly dismissed appellants' due process claim.
 
 C. Ripeness
 
 43
 The district court was also correct in dismissing as not yet ripe for adjudication the claim that the proposed substitution of in-house Medicare ALJs in place of existing Social Security ALJs violates the Secretary's statutory mandate. The proposal would essentially internalize the operation of Medicare appeals by creating a Bureau of Medicare Hearings and Appeals and hiring 42 new ALJs at a lower than usual GS-14 status. Approximately 50 percent of all hearings would be conducted by telephone. Moreover, the new Bureau would take over appeals from the Social Security Appeals Council. See Medicare Hearings, at 27, 45-47, 63. This plan, if effectuated, would obviously work a significant change. Appellants contend that the internalization of appeals would violate the language and purpose of the 1986 Amendments, lead to undue agency control over the erstwhile independent decisions of ALJs, and deny claimants their due process right to oral hearings. This attack is directed at possibilities and proposals only, not at a concrete plan which has been formally promulgated and brought into operation.
 
 
 44
 This fact alone distinguishes the case at hand from those in which pre-enforcement judicial review of administrative regulations has been permitted. See Abbott Laboratories v. Gardner, 387 U.S. 136, 148-50, 87 S.Ct. 1507, 1515-16, 18 L.Ed.2d 681 (1967). In Abbott the Commissioner of Food and Drugs, exercising authority delegated to him by the Secretary of Health, Education and Welfare, set forth specific regulations relating to the labeling of prescription drugs. Id. at 138, 87 S.Ct. at 1510. Individual drug manufacturers and their trade association brought an action to enjoin these regulations prior to their enforcement. The Supreme Court held that pre-enforcement review was not barred by the Food, Drug and Cosmetic Act, and that the issues presented were sufficiently ripe for adjudication. It held that the ripeness doctrine is designed
 
 
 45
 [T]o prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.
 
 
 46
 Id. at 148-49, 87 S.Ct. at 1515-16; see also In Re Combustion Equip. Assocs., Inc., 838 F.2d 35, 37-38 (2d Cir.1988); Seafarers Int'l Union v. United States Coast Guard, 736 F.2d 19, 26 (2d Cir.1984).
 
 
 47
 Ripeness requires a two-fold inquiry of assessing the hardship to the parties caused by withholding a judicial ruling, and of evaluating whether the issues are appropriate or fit for judicial determination. See Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. at 1515-16. This fitness inquiry is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur. See 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 3532 (1984).
 
 
 48
 That is the precise problem. The Financing Administration's plans are simply proposals subject to change in light of congressionally-authorized studies and other serious concerns, aptly summarized in the appellants' and the amicus briefs. Again, the Medicare Act itself may undergo further revisions or amendments. Were we to rule, decisions properly made by the administrative agency might be foreclosed or limited. See Pacific Gas & Elec. Co. v. State Energy Resources Comm'n, 461 U.S. 190, 200, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983). Further, this is not a case where the issues are primarily legal rather than factual, nor one in which the legal issues have so crystallized that factual development will not help clarify the legal issues. See, e.g., Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 81-82, 98 S.Ct. 2620, 2634-35, 57 L.Ed.2d 595 (1978). The issues on which we are asked to rule are still largely hypothetical. Moreover, it does not appear that any party challenging the administrative proposals will suffer undue hardship by the dismissal of their claim at this time. Hence, we hold that appellants' challenges to the Secretary's proposals do not state a case or controversy ripe for adjudication.
 
 CONCLUSION
 
 49
 For all the foregoing reasons, the judgment of the district court is affirmed.