**Sybil MACHADO, et al., Plaintiffs**

v.

**Michael O. LEAVITT, Secretary of Health and Human Services, and Michael J. Astrue, Commissioner of the Social Security Administration, Defendants.**

**Civil Action No. 07–30111–MAP.**

United States District Court,
D. Massachusetts.

April 9, 2008.

Alice Bers, Western Mass. Legal Services, Springfield, MA, Gill Deford, Center for Medicare Advocacy, Inc., Willimantic, CT, Wey–Wey Kwok, Center for Medicare Advocacy, West Windsor, NJ, J. Patterson Rae, Center for Public Representation, Northampton, MA, for Plaintiffs.

Karen L. Goodwin, United States Attorney's Office, Springfield, MA, Peter Robbins, U.S. Department of Justice, Washington, DC, for Defendants.

*MEMORANDUM AND ORDER REGARDING PLAINTIFFS' MOTION TO CERTIFY CLASS AND DEFENDANTS' MOTION TO DISMISS* (Dkt. Nos. 2 & 27)

PONSOR, District Judge.

## I. *INTRODUCTION*

Phrased generally, this lawsuit raises the following question: how egregious does an agency's failure to make timely corrections of its own mistakes have to be, and how much suffering do these uncorrected errors have to inflict, before a violation of due process may be found? Specifically, these low-income Plaintiffs contend they have suffered erroneous and excessive deductions from their monthly Social Security checks as a result of blunders by Defendants in the calculation of their prescription drug plan premiums under Medicare Part D. These mistakes,

which at this point are undisputed, have deprived Plaintiffs of hundreds of dollars for periods lasting from five to seventeen months. They seek a remedy in the form of declarative and injunctive relief requiring Defendants, the Department of Health and Human Services ("HHS") and the Social Security Administration ("SSA"), to adopt procedures that will insure that these harmful errors occur less often and, when they do occur, are corrected more promptly.

In Count I, Plaintiffs charge the two agencies with failing to comply with 42 U.S.C. §§ 1395w–24(d)(2)–(4) and 42 U.S.C. § 1395w–113(c)(1), provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 42 U.S.C. §§ 1395w–101 *et seq.* ("MMA"), mandating that HHS provide the SSA with accurate information about the monthly premiums to be deducted from Part D enrollees' Social Security benefits "by the beginning of each year" and that HHS properly update that information "periodically throughout the year." Counts II and III charge Defendants with, in effect, withholding and retaining Plaintiffs' Social Security benefits without authorization in contravention of 42 U.S.C. § 407(a), which prohibits the transfer or assignment of any Social Security recipient's right to benefits. In Count IV, Plaintiffs allege that Defendants have denied them due process, in violation of the Fifth Amendment, by negligently withholding incorrect and excessive premium amounts from their Social Security checks and refunding those improperly withheld sums only after unreasonable delay. Plaintiffs also seek certifi-

cation of a national class encompassing all Medicare recipients who have suffered similar erroneous reductions of their Social Security benefits due to Defendants' errors, and they request appointment of class counsel. (Dkt. No. 2.)

Defendants moved to dismiss Plaintiffs' claims for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) and for failure to state a claim under Fed.R.Civ.P. 12(b)(6). (Dkt. No. 27.) On March 31, 2008, the court denied Plaintiffs' motion to certify and appoint counsel, without prejudice, and allowed Defendants' motion to dismiss as to Plaintiffs' statutory claims (Counts I through III) but denied it as to the due process claim (Count IV). This memorandum will spell out the court's rationale in more detail.

## II. FACTS [1]

### A. Medicare Part D.

Plaintiffs Sybil Machado, Bennett Gordon, Mary Morgan, Janet Straczek, Carol Trisciuzzi, Inez Choma, William Choma, Kathleen Smith, Janis M. Watts, Phyllis Fagan, Ida Stefanou, Theodore Leender, and Mary–Lou Leender are all Medicare recipients who participate in the Medicare Part D program, which provides them with prescription drug benefits through private insurance plans. The Medicare Part D program went into effect on January 1, 2006. It is a substantial program, with millions of enrollees nationwide.

Participants in Part D may choose from among several benefit packages and providers. Generally, all enrollees must pay

1. As is proper on a motion to dismiss, the facts are taken from Plaintiffs' complaint. (Dkt. No. 21, First Am. Compl.) However, with regard to the issues relevant to subject matter jurisdiction and class certification, those facts are supplemented by other evidence submitted to the court as appropriate. *See Aversa v. United States,* 99 F.3d 1200,

1210 (1st Cir.1996). Specifically, in October 2007 Plaintiffs submitted affidavits attesting to certain changes in their status since the filing of their complaint on August 2, 2007. The court has considered these affidavits, since they contain the most up-to-date facts regarding Plaintiffs' circumstances. (*See* Dkt. No. 34, Exs. A–N; Dkt. No. 28, Ex. B.)

monthly premiums to the provider offering whichever plan they select. They have several options as to how to make their payments, including paying directly or asking that the premiums be withheld from their Social Security benefits and then remitted to the provider by the SSA. Approximately five million Part D participants have chosen to have their premiums taken directly out of their Social Security benefits.

The option of paying premiums through Social Security withholding requires communication regarding the correct premium amounts between the SSA and the Centers for Medicare & Medicaid Services ("CMS"), the specific unit of HHS that administers Medicare, since the two entities operate separate computer systems. Given this need for communication, the statutory provisions enacting Part D direct the Secretary of HHS to transmit to the SSA:

> by the beginning of each year, the name, social security account number, [and] consolidated monthly beneficiary premium ... owed by such enrollee for each month during the year, and other information determined appropriate by the Secretary, in consultation with the Commissioner of Social Security....

42 U.S.C. § 1395w–24(d)(3). Additionally, HHS is required to update this information "periodically throughout the year" by means of supplemental communications with the SSA. *Id.*

B. *Plaintiffs.*

Plaintiffs are all enrollees in Medicare Part D. Though their experiences with the program have varied, all of them have had difficulty straightening out errors as to the correct source and amount of the payment for their Part D premiums. Plaintiffs have undisputedly endured months of futile, and no doubt maddening, attempts to remedy improper withholdings—contacting the SSA, CMS, and their plan provid-

ers on numerous occasions only to be met with disclaimers of responsibility or false reassurances that the problem would soon be corrected. For most of them, Social Security benefits are their only source of income and the amounts erroneously withheld from those funds represent a significant deprivation and cause substantial hardship.

Plaintiffs' problems with Part D fall into several categories.

1. *Subsidized Premiums.*

Sybil Machado's monthly Part D premium of $16.90 is paid through a Massachusetts low-income assistance program. Though Machado never requested that her premiums be withheld from her Social Security benefit checks, the SSA began doing so in March 2007. Machado contacted her insurance provider, the SSA, and CMS several times to request a correction of the problem. Despite being informed on multiple occasions that the mistake would be fixed, Machado did not receive a refund of the improperly withheld premiums until August 2007, and the SSA did not cease deducting Machado's premiums from her benefits until September 2007.

Bennett Gordon had the amount of $20.50 per month wrongly withheld from his Social Security check despite the fact that his premiums were subsidized by a Connecticut assistance program. He notified his insurer of the problem in March 2006, and subsequently contacted the SSA, CMS, and other authorities to complain. The incorrect withholding continued from March 2006, in spite of repeated assurances that it would be remedied, until August 2007. At that time, Gordon received a refund and the SSA stopped deducting his Part D premiums from his benefits.

Janet Straczek similarly had premiums of $29.70 per month withheld even after she began receiving subsidies from the

Massachusetts low-income assistance program in July 2006. Though she called CMS, the SSA, and her insurer multiple times, this did not stop until December 2006 and she did not receive a refund until August 2007.

The Part D premiums of Theodore and Mary–Lou Leender are subsidized by a Connecticut low-income assistance program. When they first enrolled, they were unaware of this subsidy and elected Social Security withholding. They cancelled the withholding as of November 2006, yet had their monthly premiums of $31.49 each deducted from their respective benefit checks from January through August 2007, when the error was corrected and their money was refunded.

### 2. *Change of Plan.*

Mary Morgan was enrolled in the wrong prescription drug plan, resulting in her being liable to a plan provider for a premium of $47.70 as of January 2006. She would have owed no premium for the plan she intended to enroll in. Morgan complained about this mistake to CMS, which in November 2006 enrolled her in the correct plan effective January 2007. In December 2006, Morgan received a refund of only one month's premium rather than the eleven-month refund she was owed, and did not receive the full refund until August 2007 despite persistent petitions to CMS in the interim.

Carol Trisciuzzi switched plans effective January 1, 2007 in order to obtain a lower premium. However, even after she called CMS, her insurer, and the SSA, the old, higher premium continued to be deducted from her Social Security checks, resulting in the withholding of an extra $12.40 per month. The withholding was not changed to the proper amount until August 2007, when she was refunded the difference.

Janis M. Watts also switched from one Part D plan, with a premium of $55.60, to another with a lower premium of $29.60, but continued to have the higher premium incorrectly withheld from her Social Security benefits from January 2007 until August 2007, when the deductions were stopped and the SSA refunded the amount wrongly withheld. Watts had, in the meantime, contacted CMS, the SSA, and others on several occasions to ask for this correction.

Ida Stefanou similarly transferred from one plan to another effective March 2007, switching from withholding to direct payment of her premium. However, the $26.30 premium for her original plan was still deducted from her benefits check from March 2007 until August 2007, when the withholdings were discontinued and the deductions were refunded. Stefanou had contacted her insurer, the SSA, and Medicare numerous times, but each entity told her it was not responsible for the problem.

### 3. *Disenrollment from Social Security Withholding.*

Inez Choma at first chose (in February 2006) to have her premium ($13.92 per month in 2006 and $16.90 in 2007) withheld from her Social Security benefits, but after a problem with that mechanism she switched to paying her insurer directly and finally disenrolled from Part D altogether in November 2006. However, premiums were still withheld from her benefits from January 2007 until August 2007, and were not refunded until August 2007 after several visits and calls to the SSA, CMS, the insurer, and Choma's congressional representatives.

William Choma ended his participation in Medicare Part D in November 2006, once he became eligible for benefits from the Veterans' Administration. However, he had Part D premiums of $13.92 in 2006 and $16.90 in 2007 deducted from his Social Security benefits from November 2006

through May 2007, and did not receive a full refund until August 2007. Like his wife, Choma contacted the SSA, CMS, and his insurer to correct the error without success.

### 4. *Intermittent Withholding.*

Phyllis Fagan requested Social Security withholding to pay her monthly premium of $23.60 starting in January 2006. However, beginning in October 2006, some months no deduction occurred, and some months multiple deductions were taken from a single check. At the same time, she received notices from her insurer that it was not receiving the money withheld from her benefits check; as a result, she had to begin paying her premium directly. Fagan contacted CMS, which at first informed her that she had to pay her insurer for the missing months and that the SSA would reimburse her for the unpaid premiums for which it had withheld money.

As of September 2007, the government stated that it would instead transfer the required payments directly to the plan provider, and expected to both make that transfer and refund Fagan the money owed her by October 2007. (Dkt. No. 28, Ex. B, ¶¶ 7–8.) According to a later brief filed by Plaintiffs on October 24, 2007, Fagan was still receiving bills from her plan provider, although that statement was not supported by Fagan's accompanying affidavit.[2] (Dkt. No. 34, Pls.' Mem. in Opp. to Defs.' Mot. to Dismiss 22 n. 12; Dkt. No. 34, Ex. H.)

After electing Social Security withholding, Kathleen Smith nevertheless did not have her monthly premium of $80.00 paid from January through May 2007. She paid those premiums directly and opted out of Social Security withholding as of May 2007, yet over $200.00 was deducted

from her May benefits check. That amount was refunded only in August 2007, after she had contacted CMS, the SSA, and her insurer both by phone and letter.

### C. *Requested Relief.*

Plaintiffs allege that their experiences demonstrate a failure by HHS and the SSA to take reasonable steps to ensure that the premium withholding amounts are correctly calculated for Part D participants, as the law requires. They therefore seek an injunction directing the two agencies "to cease improperly retaining withheld Part D premium amounts," "promptly cease withholding Part D premium amounts ... which beneficiaries have not elected or authorized to be withheld," "refund to beneficiaries on a prompt and efficient basis all premium amounts that have been improperly withheld to date," and take other steps as necessary to protect beneficiaries' rights to elect how to pay their premiums and to choose their prescription drug benefit plans. (Dkt. No. 1, Compl. 21.) As noted, Plaintiffs also moved for certification of a class consisting of all Part D enrollees who have experienced similar problems with premium withholding.

### III. *DISCUSSION*

Both Rule 12(b)(1) and Rule 12(b)(6) require the acceptance of Plaintiffs' well-pleaded facts as true and the drawing of all reasonable inferences in their favor, although the court will not "credit conclusory allegations, subjective characterizations, or outright vituperation." *McCloskey v. Mueller*, 446 F.3d 262, 266 (1st Cir.2006).

The court will address first Defendants' argument that the conceded rectification of the particular injuries suffered by the

---

**2.** Defendants responded with an affidavit attesting to the payment of a refund to Fagan, but did not provide any update as to pay-

ments made to her plan provider. (Dkt. No. 36, Decl. of Beatrice M. Disman.)

named Plaintiffs renders this lawsuit moot. It will then turn to an analysis of the two statutes cited by Plaintiffs as the foundation for their claims in Counts I through III. Finally, the court will examine Plaintiffs' due process claim, set forth in Count IV, in the generous light afforded it in the context of a motion to dismiss.

### A. *Mootness.*

■ Defendants first contend that the claims offered here are moot because all Plaintiffs have finally had their premium withholding amounts corrected and any excess withholdings refunded. This argument is easily disposed of. Defendants do not dispute that problems such as those afflicting Plaintiffs have occurred and, to some extent, continue to occur, as a result of errors in the administration of Medicare Part D. (*See* Dkt. No. 28, Ex. A, at 1 ("[T]here are some normal processes related to Medicare Parts C and D that will continue to result in a small number of beneficiaries experiencing temporary issues with their premium withholding.").) At the same time, it cannot be denied that the relatively narrow window of time for correction of withholding errors (for these Plaintiffs, between five and seventeen months) inevitably means that a particular mistake will often be remedied before a court has the chance to review its lawfulness. Under these circumstances, Plaintiffs' suit fits within the mootness exception for claims " 'capable of repetition, yet evading review.' " *Cruz v. Farquharson,* 252 F.3d 530, 534 (1st Cir.2001) (*quoting S. Pac. Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911)). Should any of these plaintiffs decide to change health plans or opt into or out of Social Security premium withholding, there is a distinct possibility that the kind of error that they have previously suffered could recur. The mootness doctrine does not deprive the court of the power to act in such a situation.

### B. *Count I.*

■ To support this portion of their complaint Plaintiffs cite the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 42 U.S.C. §§ 1395w–101 *et seq.* ("MMA"). The provisions of this statute strongly suggest that, in its enactment, Congress granted HHS substantial discretion in implementing the Part D premium withholding program. The only explicit requirement imposed on HHS in the law is the modest responsibility to transmit the necessary information about Part D enrollees to the SSA "by the beginning of each year" and to update that data "periodically throughout the year." 42 U.S.C. § 1395w–24(d)(3). *Compare id.* § 1395w–114 (c)(1)(C) ("The Secretary shall provide a process whereby ... the Secretary periodically and *on a timely basis* reimburses the [prescription drug provider] for the amount of [premium] reductions ....") (emphasis added).

Significantly, the MMA sets no deadline by which Defendants must correct premium withholding errors and no time limit within which CMS must refund any incorrectly withheld benefits. The communication and updating obligations set forth in the law seem designed, not to protect beneficiaries, but merely to facilitate the basic operation of this vast program. It is hard to see how these implementing provisions can be construed to constitute a vehicle for redress of inevitable errors and delay.

The District Court for the District of Columbia recently addressed a lawsuit very similar to the one now before this court, involving the communication of timely and accurate information by CMS to permit reimbursement of pharmacies and pharmacists for provision of prescription drugs to persons in long-term care facilities. In that case the judge rejected a

request by the plaintiffs that the court order CMS "to be more timely or more accurate" in transmitting information, observing that "nothing in the MMA establishes any benchmarks for data accuracy or mandates any time tables by which CMS must provide eligibility data." *Long Term Care Pharm. Alliance v. Leavitt*, 530 F.Supp.2d 173, 184 (D.D.C.2008).

In support of this decision, *Long Term Care* noted the Supreme Court's admonition in *Norton v. Southern Utah Wilderness Alliance* to resist entering "general orders compelling compliance with broad statutory mandates ..." 542 U.S. 55, 66, 124 S.Ct. 2373, 159 L.Ed.2d 137 (*quoted in Long Term Care*, 530 F.Supp.2d at 184–85).

Plaintiffs' invocation of the annual reporting and periodic updating language of the MMA as justification for a broad remedial order by this court is as untenable in this case as it was in *Long Term Care*. Court-ordered establishment of administrative mechanisms to reduce error and to correct reported mistakes more promptly would risk involvement by the court in agency procedures and resource allocation that could not have been contemplated by Congress in enacting the MMA. Whether analyzed as a question of standing or failure to state a claim, the argument that the MMA provides a basis for remedial action in these circumstances simply will not hold up.

*Chagnon v. Bowen*, 792 F.2d 299 (2d Cir.1986), and *Holman v. Califano*, 835 F.2d 1056 (3d Cir.1987), cited by Plaintiffs, offer tepid support for their case. Both these decisions involved situations, unlike here, where the SSA had an explicit statutory duty to pay out benefits "within a reasonable time after a favorable decision," thus narrowing the agency's discretion under the statute.

*Situ v. Leavitt*, No. 06–2841, 2006 WL 3734373, 2006 U.S. Dist. LEXIS 94391 (N.D.Cal. Dec. 18, 2006), offers somewhat stronger support for Plaintiffs. That case deals with plaintiffs seeking prompt compliance by HHS with its statutory duties under Medicare Part D, with respect to notification to and enrollment of "dual eligible" beneficiaries able to receive health care under either Medicare or Medicaid. The district judge in *Situ* provisionally ruled that the lawsuit could proceed in the face of a standing challenge. *Id.* at *4–*8, 2006 U.S. Dist. LEXIS 94391 at *12–*23. This decision, however, offered no extended analysis of the statutory basis for the plaintiffs' claim and, in a later decision on the issue of class certification, simply stated that "it remains to be determined whether the relief Plaintiffs seek is warranted." *Situ v. Leavitt*, 240 F.R.D. 551, 563 (N.D.Cal.2007). To the extent that this decision stands for the proposition that the MMA provides a *statutory* foundation for an enforceable claim to prompt action by SSA and HHS, this court finds it unpersuasive.

■ Finally, the argument that Defendants have failed to satisfy the MMA's well-articulated requirement of transmitting premium withholding information annually, based on the nearly eighteen-month delay in correcting an improper withholding from plaintiff Bennett Gordon, does not justify denial of Defendants' motion to dismiss Count I. The obligation to perform the yearly updating does not carry with it the concomitant obligation that this updating be one hundred percent correct, nor does it suggest that inevitable mistakes with a program of this size must, by operation of the statute itself, be corrected within any particular time frame. A single example of a delay of more than one year,[3]

---

**3.** Notably, all of the other plaintiffs' withholdings were changed to the correct amount

within twelve months of their initial com-

though certainly unfortunate, does not support a conclusion that CMS has failed outright to periodically communicate premium withholding information to the SSA as required by the statute.

## C. *Counts II and III.*

■ 42 U.S.C. § 407(a), which prohibits the transfer or assignment of a person's right to Social Security benefits, offers an even less tenable foundation for court action on the facts as alleged. Congress had to have known that the mechanism for implementing Medicaid Part D premium withholding would, like all things human, sometimes fail to operate flawlessly. Errors would be inevitable, and if Congress had meant them to subject the defendant agencies to statutory liability it would have recognized this possibility explicitly. While, as will be seen, an uncorrected error if sufficiently egregious may conceivably constitute a due process violation, it cannot qualify as a wrongful "transfer or assignment" of Social Security benefits in violation of § 407(a). *Cf. Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler,* 537 U.S. 371, 385 n. 7, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003) (holding that the appointment of a state department as the representative payee of a beneficiary cannot violate § 407(a), since the Social Security Act expressly contemplates such a role for the department).

Moreover, Plaintiffs have cited no authority, and common English usage offers no support, for the proposition that an administrative error, even when gross and accompanied by inexcusable delay in its correction, can constitute a "transfer or assignment" of a Social Security benefit. Again, whether analyzed under standing doctrine or failure to state a claim, Counts II and III do not offer a legally viable theory of recovery.

## D. *Count IV.*

■ It is well established that a sufficiently egregious delay in processing or awarding an entitlement may constitute a remediable constitutional violation, even if the relevant statutory framework does not specify a timeline for agency action. *See, e.g., Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 547, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("At some point, a delay in the post-termination hearing would become a constitutional violation."); *Schroeder v. Chicago,* 927 F.2d 957, 960 (7th Cir.1991) ("[A]t some point delay must ripen into deprivation."); *Isaacs v. Bowen,* 865 F.2d 468, 477 (2d Cir.1989) ("[D]elay can be so unreasonable as to deny due process, such as when it is inordinately long or when a recipient demonstrates immediate financial need."); *Cronin v. Town of Amesbury,* 895 F.Supp. 375, 388–89 (D.Mass.1995) (and cases cited therein).

■ It is equally well established that unconstitutional delays may be amenable to judicial remedies such as an order for the issuance of individual benefits, monetary damages, or, more rarely, the setting of deadlines for agency action. *See, e.g., White v. Mathews,* 559 F.2d 852, 855 (2d Cir.1977) (affirming on statutory grounds a district court holding that delays in Social Security hearings violated statutory and due process requirements, and establishing time limits for permissible delay); *Kraebel v. N.Y. City Dep't of Housing Preservation & Dev.,* 959 F.2d 395, 406 (2d Cir. 1992) (mentioning possibility of damages award for unconstitutional delay); *Andujar v. Weinberger,* 69 F.R.D. 690, 694 (S.D.N.Y.1976) (noting that mandamus relief might be appropriate remedy). Thus, the redressability argument that undercuts Plaintiffs' standing as to their statutory charge has far less force with respect to their constitutional claim.[4] *Cf. id.* at 695–

---

plaints, although for some obtaining a refund took somewhat longer.

4. Judge Posner of the Seventh Circuit has questioned the existence of any due process

96 ("While we agree that federal courts should not assume the task of supervision of an agency's work, we do not believe that federal courts can refuse to hear claims of deprivation of constitutional rights on the ground that the result might be a directive to an administrator to adjust procedures so as to comport with constitutional guarantees.").

■ The court cannot at this stage of litigation say that Plaintiffs have no valid claim that the delays they suffered constituted deprivations of due process. The delays suffered by Plaintiffs—most in the range of five to thirteen months, with two individuals (Gordon and Fagan) waiting well over a year—were undisputably substantial. Moreover, the amounts at stake made the magnitude of the delays especially significant for Plaintiffs, most of whom had no other source of income besides their Social Security benefits. *See Gray Panthers v. Schweiker*, 652 F.2d 146, 156 (D.C.Cir.1980).

■ It is true that delays on the order of months or even years are not rare in the context of government benefit programs with millions of participants. *See Isaacs v. Bowen*, 865 F.2d 468, 477 (2d Cir.1989) (characterizing six to nineteen month delay in completing claims processing as "[un]remarkable in the Medicare, Social Security and employment benefits systems"). On the other hand, the length of a delay is only part of the due process analysis. Ul-

timately, the decision on liability will rest on a broad reasonableness determination, drawing the constitutional line between those permissible delays that are the "natural concomitant of our administrative bureaucracy," *id.*, and actionable dilatory behavior that is "egregious and without any rational justification." *Kraebel v. N.Y. City Dep't of Housing Pres. & Dev.*, 959 F.2d 395, 405 (2d Cir.1992), *cert. denied*, 506 U.S. 917, 113 S.Ct. 326, 121 L.Ed.2d 245 (1992).

Courts have been careful to grant agencies substantial leeway in accomplishing the often complex and demanding tasks assigned to them, setting a high threshold for finding unconstitutional governmental delay. *See Cronin v. Town of Amesbury*, 895 F.Supp. 375, 388 (D.Mass.1995) ("[C]ourts have been reluctant to declare a tardy post-deprivation remedy inadequate except in extreme cases."). In the most commonly referenced case affirmatively declaring agency delay to constitute a violation of due process, nearly four years had lapsed and the government still had not finished processing a disability application. *Kelly v. R.R. Retirement Bd.*, 625 F.2d 486, 491 (3d Cir.1980). *Compare Reagan v. Sec'y of Health & Human Servs.*, 877 F.2d 123, 126 (1st Cir.1989) (holding that two month delay at issue, or nine month delay in *Littlefield v. Heckler*, 824 F.2d 242 (3d Cir.1987), was not "the

---

right to receive a benefit by a certain date where the relevant statute specifies no particular deadline. *Schroeder v. Chicago*, 927 F.2d 957, 959–60 (7th Cir.1991). Here, however, the claimed injury is not merely delay in bestowing a benefit, but a wrongful taking from a benefit already awarded and an allegedly unreasonable delay in restoring what has been wrongfully taken. Even in these circumstances the crafting of an appropriate judicial remedy for unconstitutional delay would require careful consideration. *See Heckler v. Day*, 467 U.S. 104, 119 n. 33, 104

S.Ct. 2249, 81 L.Ed.2d 88 (1984) (refusing to set mandatory deadlines for resolution of Social Security claims of entire class of plaintiffs, but reserving option of injunctive relief for individual claimants); *Wright v. Califano*, 587 F.2d 345, 356 (7th Cir.1978) (outlining danger that judicially imposed timeline will merely increase burden on agency and consequential delay for Social Security beneficiaries). But consideration of a proper remedy, assuming liability is shown, is not the issue now before the court.

kind of egregious delay" that might violate due process).

Even as to the four-year wait in *Kelly*, the Third Circuit noted that the record indicated the delay was not merely overlong but also appeared unjustified. 625 F.2d at 491 (stating that the evidence did not support the argument that the time taken by the agency was necessary to gather medical evidence); *see also Littlefield*, 824 F.2d at 247 (noting that "there is no allegation of bad faith, a dilatory attitude, or a lack of evenhandedness by the Secretary" in rejecting claim of unconstitutional delay).

Other courts have similarly expressed trepidation about finding due process violations where an agency's delay seems to have been result of the demands of implementing a national administrative scheme. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (finding no due process violation where the complaint merely set out a "chronology of the proceedings ... coupled with the assertion that nine months is too long to wait"); *Silverman v. Barry*, 845 F.2d 1072, 1084 (D.C.Cir.1988) (stating that "[w]e cannot ignore the practical constraints that operate on a government office" in dismissing due process claim based on agency delay).

As the Seventh Circuit explained in *Wright v. Califano*:

> [S]ince administrative efficiency is not a subject particularly suited to judicial evaluation, the courts should be reluctant to intervene in the administrative adjudication process.... [W]e are not justified in sanctioning the imposition of unrealistic and arbitrary time limitations on an agency which for good faith and unarbitrary reasons has amply demonstrated its present inability to comply.

587 F.2d 345, 354–55 (7th Cir.1978). At the same time, delay without justification clearly falls outside of constitutional bounds. *See Kraebel v. N.Y. City Dep't of Housing Preservation & Dev.*, 959 F.2d 395, 405 (2d Cir.1992) ("[D]elay in processing can become so unreasonable as to deny due process.").

The brief review of authorities above demonstrates the difficulty that Plaintiffs may face in assembling facts sufficient to support their claim. At the same time, it confirms the existence of a well-recognized theory of recovery. The record at present contains insufficient information about the cause of the delays in this particular case to allow the court to judge the legal viability of the claim set forth in Count IV. While Medicare Part D is undoubtedly a complex program involving two agencies, separate computer systems, and millions of enrollees, the errors in question with respect to Plaintiffs appear to have been relatively straightforward. The correction of mistakes in premium withholding amounts is, at the very least, far simpler than tasks such as the processing of claims for medical or employment benefits, where long delays are more easily tolerated. *Compare Isaacs v. Bowen*, 865 F.2d 468, 477 (2d Cir.1989). The justification for delays of several months or even over a year is unclear in the context before the court now.

For this reason, Plaintiffs' due process claim cannot be resolved on the pleadings alone. Instead, the court will follow the path chosen by the Second Circuit when it, too, was confronted with an allegation of substantial delay with murky causes. In *Kraebel v. New York City Department of Housing Preservation & Development*, the court remanded for further factual development a claim of unreasonable delay against New York City in failing to make timely payments under a municipal rent subsidy program, stating:

> While we recognize that "regrettably, delay is a natural concomitant of our

administrative bureaucracy," ... we are not prepared to conclude, without further evidence, that the delays here are reasonable. Although no bright-line rule exists for determining when a delay is so burdensome as to become unconstitutional, we think that there is at least a question of fact as to whether these delays were egregious and without any rational justification. Given the case-by-case approach required in due process cases, ... the issue must be determined on a full evaluation of all the circumstances.

959 F.2d 395, 406 (2d Cir.1992) (citations omitted).

*Kraebel* directed the district court to examine factors such as the procedures used in the city's determination, the variables taken into consideration, the work required to make the decision, any need for appellate review, the amount of time taken in making similar determinations, "and any other factors that may bear on whether 'due process' is provided." *Id.* at 406. Once discovery is conducted, these factors may turn out to weigh against finding any due process violation. To repeat, however, the theory of recovery underlying Count IV cannot be said to lack merit.[5]

## IV. *CONCLUSION*

Based on the foregoing, on March 31, 2008, the court denied without prejudice Plaintiff's motion for class certification and appointment of class counsel (Dkt. No. 2), allowed Defendants' motion to dismiss (Dkt. No. 27) as to Counts I through III, and denied the motion as to Count IV. Due to the time needed to dispose of these pretrial motions, the deadlines for discovery established by Chief Magistrate Judge Neiman have passed. The parties will submit, on or before April 30, 2008, an agreed schedule for completion of all discovery. If disputes make submission of an agreed schedule impossible, then individual proposed schedules may be submitted, and the court will consider them before issuing its own scheduling order.

It is So Ordered.

---

5. The logic of the court's decision is obviously fatal to Defendant's contention that the court lacks subject matter jurisdiction, since jurisdiction over the due process claim will lie under 28 U.S.C. § 1331.